UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**UNITED STATES OF AMERICA,**

   *Plaintiff*,

v.                                            **CASE NO. 5:22-CR-00671-JKP-1**

**DAVID CHAVEZ, JR.**

   *Defendant*.

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant David Chavez Jr.'s Motion to Suppress (the "Motion"). *ECF No. 49*. The United States Government (the "Government") filed a Response to which Chavez filed a Reply. *ECF Nos. 55, 57*. Additionally, the Government filed a Surreply. *ECF Nos. 58, 59*. The motion therefore is fully briefed and ripe for ruling. The Court held a hearing on the Motion April 22, 2025. Min. Ent. Apr. 22, 2025. At the conclusion of the hearing, the Court provided the parties an opportunity to file an advisory identifying additional caselaw for the Court to consider. The parties then filed their respective advisories with the Court. *ECF Nos. 75, 76*. After due consideration of the parties' briefings, legal arguments, evidence, and the applicable law, the Court concludes the Motion will be **DENIED**.

### BACKGROUND

In early November 2022, DEA Task Force Officer David Camacho ("TFO Camacho") received information from a confidential source ("CS") regarding the drug trafficking activities of an individual identified as "Lucky." *ECF No. 55 at 2*. The CS provided Lucky's telephone number to TFO Camacho. *Id*. TFO Camacho learned the telephone number belonged to Defendant (David "Lucky" Chavez). *Id*.; *See ECF No. 49 at 2*.

TFO Camacho supervised the CS's communications with Defendant "regarding the availability, price, and acquisition of illegal narcotics." *ECF No. 55 at 2; See also ECF No. 49 at 3*. The Government states, "[e]xcept for one instance involving technical difficulties, the TFO monitored the text and audio communications between the CS and [Defendant] in real time." *ECF No. 55 at 2*.

The Government contends the CS and Defendant were communicating via phone calls and text messages on November 17, 2022, to arrange a drug deal. *ECF No. 55 at 2*. At 3:57 p.m., the CS sent a text message to Defendant to inquire about purchasing nine ounces of crystal methamphetamine. *Id*. Defendant responded and agreed to conduct the drug transaction. *Id*. Shortly after 7:00 p.m., the CS sent the address for the drug transaction, and Defendant informed the CS he would arrive in a white Chevrolet Impala. *Id*. After viewing this text conversation in real time, officers set up surveillance at the parking lot near the arranged meeting place for the purported drug transaction. *Id*.

At 7:42 p.m., TFO Camacho saw a white Chevrolet Impala arrive and "park directly next to his undercover vehicle." *Id*. TFO Camacho confirmed the vehicle was registered to Defendant. *Id*. At 7:44 p.m. Defendant sent a text message to TFO Camacho (who Defendant believed was the CS) to "hop in" his vehicle. *Id. at 2–3*. The CS was not at the site of the alleged drug transaction. *Id. at 3*.

Following these events, officers seized Defendant. While the Government argues officers detained Defendant, Defendant argues officers arrested him without probable cause. *ECF No. 55 at 3; and ECF No. 49 at 6*. Upon seizing Defendant, officers "observed one clear gallon size Ziploc style bag containing multiple individually packaged sandwich-style baggies on the driver-side floorboard of the Impala, which contained crystal methamphetamine." *Id*.

Officers searched the car and discovered the following items:

1. Within the driver-side door panel, Agents/Officers located 6 individually packaged sandwich baggies containing heroin.

2. In the cupholder, within the center console of the vehicle, Agents/Officers located a stolen Glock 22 .40 caliber pistol loaded with an extended clip containing .40 caliber bullets. Government's Exhibit 4.

3. A second handgun magazine containing .40 caliber bullets was also seized from the center console area.

4. A belly band holster.

5. Agents/Officers also seized another clear sandwich-style baggie containing a crystal Methamphetamine on the center console.

6. Within a red Michael Jordan backpack on the front passenger seat, Agents/Officers located 4 sandwich baggies containing black tar heroin, multiple sandwich baggies containing crystal Methamphetamine, and one functional digital scale and other miscellaneous items, including a ledger.

*Id*. The parties submitted four bodycam videos for the Court's consideration on the Motion.[1]

### TFO Camacho's Testimony At the Hearing

TFO Camacho testified at the hearing on the Motion April 22, 2025. *Hrg. Trans. at 7:24*. TFO Camacho is employed by the Guadalupe County Sheriff's Office, Narcotics Division, and is assigned to a Drug Enforcement Administration ("DEA") Task Force. *Id. at 8:1–15*. He has served as a law enforcement officer for nineteen years and worked with the DEA for fourteen years. *Id*. He investigates drug trafficking offenses. *Id*. This investigation began with information provided by a confidential source. *Id. at 8:19–25*. A total of two confidential sources were involved in the investigation into Defendant's alleged drug distribution. *Id*.

Regarding the investigation into Defendant's drug distribution, TFO Camacho testified he received information regarding a drug trafficker distributing heroin and methamphetamine in

---

[1] The parties submitted the following bodycam videos: (1) Officer Dylan Peele; (2) Officer Jeremy Jockisch; (3) Officer Keegan Eichholtz; and (4) TFO David TFO Camacho. Both parties submitted Officer Peele's bodycam. Therefore, there are only four independent videos.

the San Antonio area. *Id. at 9:2–9*. The trafficker's alias was "Lucky." *Id*. The confidential source provided TFO Camacho with Lucky's phone number. *Id. at 9:17–18*. Utilizing a subpoena, law enforcement officers obtained Lucky's subscriber information and address. *Id. at 10:11–11:9*. Based on the subscriber information provided by the phone carrier, Lucky was determined to be David Chavez—the defendant in this case. *Id*.

TFO Camacho then searched Defendant's name in the Texas Department of Criminal Justice database and conducted a search of driver's license records. *Id. at 11:19–21*. TFO Camacho, discussing Government Exhibit 2, testified Defendant had convictions for possession of drugs (a 2012 possession of a controlled substance 4–200 grams; and a 2018 possession of a controlled substance 4–200 grams) and a 2016 tampering with evidence conviction. *Id. at 12:13–15*. *See* also Gov't. Ex. 3 at 2. Defendant was on parole when the events giving rise to the charge in this case occurred.[2] *Id.; see also Gov't. Ex. 3 at 5*. TFO Camacho also testified Defendant was previously arrested for assault on a public servant and has a family violence conviction. *Id. at 13:15–14:14*.

TFO Camacho used the information he obtained to conduct a DEA required threat assessment to determine the best manner to approach Defendant. *Id. at 14:15–15:15*. TFO Camacho testified Defendant's threat or risk assessment was "very high," which meant officers needed to be very cautious in any encounter with him. *Id. at 15:7–15*. Defendant's prior incarcerations, criminal history, his parole status, and bond status for a pending driving while intoxicated charge were considerations included in making the threat assessment. *Id*.

Based on the threat assessment, officers decided to conduct an assault on Defendant's vehicle when he arrived at a designated location. *Id. at 15:16–23*. Officers decided this was the

---

[2] Defendant's parole began on June 22, 2021, and his discharge date was scheduled for September 26, 2023. The events in this case occurred in November 2022.

best approach to ensure officer safety and safety of the public. *Id*. TFO Camacho described an assault on a vehicle in the following manner:

> We utilize marked patrol vehicles, uniformed officers, multiple undercover vehicles, and upon the arrival of the defendant we -- the term we use is contain the front and the rear of the suspect vehicle to prevent him or her from fleeing and/or injuring somebody else in the parking lot, public parking lot.

*Id. at 16:1–6*. TFO Camacho testified he has been involved in approximately 300–400 drug trafficking investigations leading to arrests, and based on his training and experience, in eighty-five percent of those episodes a firearm was involved. *Id. at 16:7–15*. He testified this was a factor to consider in approaching every drug trafficking investigation to ensure officer and public safety. *Id. at 16:16–22*.

TFO Camacho next explained the use of confidential sources in this case. Law enforcement provided the sources with cellular phones which included an application that covertly recorded conversations. *Id. at 17:3–25*. The application allowed TFO Camacho to monitor all communications between the confidential source and the target of the investigation. *Id*. He could see any incoming text messages, see and hear any calls, and view any pictures exchanged between the confidential source and the target. *Id*. The confidential source and TFO Camacho each had the application downloaded to their respective phones. *Id*. In response to questions from the Court, TFO Camacho clarified the user must open the application and then dial a number using the application's keypad (and not the keypad a caller would normally use when a caller uses a phone's icon to dial a number). *Id. at 18:6–15*. The dialed phone number is only saved in the application and not in a cell phone's normal phone log which is accessed when a user opens the telephone icon available on most cell phones. *Id. at 18:16–22*. When the confidential source is using the application, TFO Camacho can open the application on his phone to monitor communications. *Id at 19:1–7*. He stated,

5

> Q. So, as calls are being made, are you able to listen to them as the actual call is being made and taking place?
>
> A. Yes, my phone rings as their phone rings. My phone alerts as their phone alerts the messages, so I get it live.
>
> Q. So you can watch as text communications are happening in real time as well as calls and listen to voicemails?
>
> A. Yes.

*Id*. A unique ring tone is used when a communication is received through the application. *Id. at 19:16–19*. TFO Camacho testified,

> So, I'll answer it like any other phone call. If the CS is getting a phone call, I'm getting the phone call and my phone is ringing, I answer it, it gets me to a teleprompt, to hear this telephone call hit 1, I hit 1, and I'm hearing everything that's going on between the CS and the defendant.

*Id. at 19:22–20:1–2*. When TFO Camacho used the application to listen to a conversation between the confidential source and Defendant, they could not hear him because the application only allowed TFO Camacho to listen to the call. *Id. at 20:6–10*. Calls between the confidential source and the target of an investigation are recorded and stored in a database available through the application. *Id. at 20:18–25*. He cannot alter the contents of the recorded conversations. *Id. at 21:6–9*. The sources in this case used the covert listening and recording application to communicate with Defendant in this case. *Id. at 21:13–22*.

TFO Camacho instructed one of the confidential sources to attempt to arrange a purchase of narcotics from Defendant on November 8th, but TFO Camacho rejected the proposed location because Defendant allegedly wanted to meet at his hotel. *Id. at 27:8–25*. TFO Camacho believed meeting at this location was unsuitable because of concerns for officer and confidential source safety, and he was not very familiar with the location. *Id*. TFO Camacho wanted a plan requiring

Defendant to come to the officers. *Id. at 28:1–2*. TFO Camacho explained the steps officers took to prepare for a potential encounter with Defendant on November 17th, stating

> Q. So at some point during receiving all these messages and viewing these communications, what if anything do you begin to do as these communications are coming in on November 17?
>
> A. We rally up with the task force members at a predetermined location, I provide everybody with the photograph of Mr. Chavez and the updated information which he provided the informant with which was make and model and color of his vehicle, give everybody a task on what their role is during the high risk apprehension of the defendant and the vehicle assault, make sure everybody is on the same page and make sure everybody knows what we're doing. One of the biggest things is uniform presence, make sure that the defendant knows that we're law enforcement and we're all tacked out and lights and sirens and uniform patrol car is going to be pretty much primary as well too.

*Id. at 33:11–34:3*. TFO Camacho also discussed factors he considered relevant leading up to the encounter with Defendant, including Defendant's criminal history, his parole and bond status, the amount and type of drug involved, Defendant's violent history, the location, and safety of the Defendant, officers, and the public. *Id. at 34:11–22*. TFO Camacho explained the plan was to "[a]ssault the vehicle, ensure that he's not able to flee or injure anybody else or himself upon his arrival to the agreed meet location." *Id. at 35:4–7*.

On cross examination, TFO Camacho confirmed law enforcement officers chose the Valero gas station close to interstate highway 35, near Schertz, Texas. *Id. at 58:5–11*. TFO Camacho surveilled Defendant once he arrived at the gas station. *Id. at 58:12–14*. TFO Camacho drove an unmarked vehicle during the operation. *Id. at 58:15–16*. He observed Defendant for approximately fifteen minutes. *Id. at 58:17–18*. Using the cell phone application, he was able to see the text messages between the confidential source and Defendant. *Id. at 58:19–21*. The confidential source was not present when officers conducted their assault on Defendant's vehicle. *Id. at 59:12–14*. TFO Camacho stated "we got him," (referring to Defendant) when

7

Defendant asked TFO Camacho (posing as the confidential source) to hop in his vehicle." *Id. at 60:17–19*. TFO Camacho confirmed the pump (the location of Defendant's vehicle) and license plate before officers made physical contact with Defendant. *Id. at 60:20–23*. TFO Camacho verified officers blocked Defendant's vehicle to prevent it from moving. *Id. at 62:6–8*. Officers gave commands to Defendant to roll down his windows and he complied. *Id. at 62:20–22*. Thirteen officers were present and all were armed; some officers were armed with assault style rifles. *Id. at 63 at 3–8*. Officers gave commands to Defendant to roll down his windows, to put his hands out of the driver's side window, to get out of the car, to kneel down, and to put his hands behind his head, and he complied with these orders. *Id. at 63:11–64:5*. At least four officers approached Defendant while he was kneeling down, with his hands on his head, and the officers' weapons were drawn and pointed at Defendant. *Id. at 64:16*.

On re-direct examination, TFO Camacho testified he has been involved in encounters where he discovered additional occupants after closer inspection of a vehicle with tinted windows. *Id. at 80:20–81:6*. He further testified the officers did not lower their weapons when Defendant was on his knees with his hands on his head because they had not patted him down and had not inspected the vehicle to ensure no one else was in the car. *Id. at 82:7*.

## BURDEN OF PROOF

The Fourth Amendment guarantees individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *United State v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011) (*quoting* U.S. Const. amend. IV). The exclusionary rule, a judicially created deterrence measure, provides evidence obtained by an unreasonable search or seizure generally may not be used as evidence of guilt at trial. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961); *Weeks v. United States*, 232 U.S. 383, 393 (1914). Warrantless searches and seizures

are *per se* unreasonable subject to certain narrow exceptions. *Cotropia v. Chapman*, 978 F.3d 282, 286 (5th Cir. 2020) (quoting *United States v. Kelly*, 302 F.3d 291, 293 (5th Cir. 2002)). The government bears the burden of showing an exception applies. *United States v. Roberts*, 612 F.3d 306, 309 (5th Cir. 2010) (quoting *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005)).

## I. Reasonable Suspicion

The law permits officers "to conduct brief investigatory stops based on reasonable suspicion that the person is engaged in criminal activity or wanted in connection with a completed felony." *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022) (citing *United States v. Hensley*, 469 U.S. 221, 229 (1985); *Terry v. Ohio*, 392 U.S. 1, 27–31 (1968); *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994) (en banc)). The seizure of a person "must be 'justified at its inception.'" *Id*. (citing *United States v. Thomas*, 997 F.3d 603, 609 (quoting *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185 (2004))). Reasonable suspicion must exist before an officer detains a person. *Id*.

Reasonable suspicion is a low bar or threshold and requires a "minimal level of objective justification." *Id*. (citing *United States v. Castillo*, 804 F.3d 361, 367 (5th Cir. 2015) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989))). Reasonable suspicion must be based on "specific and articulable facts" and cannot be founded on a mere hunch. *Id*. (citing *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014) (quoting *United States v. Sanders*, 994 F.2d 200, 203 (5th Cir. 1993))). In determining whether reasonable suspicion exists, courts consider the totality of the circumstances or the entire picture of a person's encounter with law enforcement. *Id*. (citing *Kansas v. Glover*, 589 U.S. 376, 386 (2020) (quoting *Prado Navarette v. California*, 572 U.S. 393, 397 (2014))). "Whether an officer has reasonable suspicion to stop is answered from

the facts known to the officer at the time." *Id*. (citing United *States v. Vickers*, 540 F.3d 356, 361 (5th Cir. 2008)).

Reasonable suspicion can also be based on information provided by a confidential source or informant. The Fifth Circuit, in *United States v. Powell*, 732 F.3d 361, 369–70 (5th Cir. 2013), stated:

> Reasonable suspicion can be formed by a confidential informant's tip so long as the information is marked by "indicia of reliability." *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *United States v. Zamora,* 661 F.3d 200, 207 (5th Cir.2011). In *United States v. Martinez,* 486 F.3d 855, 861 (5th Cir.2007), we discussed a number of the factors applied in determining whether a tip provides reasonable suspicion, including: "the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale." *Id.*

**DISCUSSION**

Defendant challenges the propriety of his initial seizure and the subsequent search of his vehicle. More specifically, Defendant argues the initial seizure constituted a *de facto* arrest, requiring probable cause, based on: the officers' use or show of force (multiple officers with drawn weapons), the number of officers present at the scene, the fact officers' vehicles blocked Defendant's vehicle from moving forward or backwards, and the fact Defendant was immediately handcuffed once he followed commands to exit his vehicle. The Government counters prior to the seizure TFO Camacho was aware of Defendant's criminal history, which established Defendant was on parole for a drug offense, on bond for a driving while intoxicated offense, and Defendant also had family violence offenses and an additional offense relating to interfering with the duties of a public servant. The Government also argues Defendant has a history of additional drug offenses.

10

The Court notes certain objective facts surrounding Defendant's encounter with law enforcement. TFO Camacho exited his vehicle at 7:44 p.m. on November 17, 2022 (the Court observed the digital clock on the center screen of TFO Camacho's vehicle as he exited the vehicle at 32 seconds of elapsed time on Government's Exhibit 5). The sky was dark, but the gas station and the convenience store adjacent to the gas pumps provided ample lighting for the officers at the scene and the Court viewing the video. Notwithstanding the generally good lighting, Defendant's vehicle had very dark windows. The Court was able to hear sirens blaring and flashing lights from officers' vehicles. Officers assumed positions behind their vehicles with their weapons drawn and pointed at the suspect vehicle and issued loud commands for Defendant to show his hands. The Court was able to hear officers communicating with one another about their ability or inability to see the driver's hands. The Court heard officers command Defendant to roll down all the windows. Officers had a real time concern there may be passengers in the vehicle. Defendant complied with the officers' commands, and he was placed in handcuffs. Officers lowered their weapons once Defendant was secured and they confirmed there were no passengers in the vehicle. Government Exhibit 3 clearly shows a Ziploc style clear bag with suspected narcotics near the driver's seat and scattered United States currency on the driver's side floorboard. *ECF No. 55 at 13*. There was also a pistol in the center cupholder of the vehicle. Government Exhibit 4 (*ECF No. 55 at 15*).

## I. Detention vs. *De facto* Arrest

Defendant's core argument is he was arrested without probable cause. *See ECF Nos. 49, 57, and 76*. Defendant also argues, however, even if he was detained instead of arrested, he was detained without reasonable suspicion. The Government argues Defendant was briefly detained,

and subsequently arrested after officers searched his car on the basis of their observation of narcotics and United States currency on the driver side floorboard. *See ECF Nos. 55, 58, and 75*.

Defendant relies on *U.S. v. McQuagge*, 787 F.Supp. 637 (5th Cir. 1991), to support his contention officers arrested him without probable cause. The Court reviewed *McQuagge*, and other caselaw, including *U.S. v. Sanders*, 994 F.2d 200 (5th Cir. 1993), *U.S. v. Campbell*, 178 F.3d 345 (5th Cir. 1999), and *U.S. v. Perkins*, 226 F.3d 642 (5th Cir. 2000), to determine whether the officers' conduct constitutes a *Terry* stop or a *de facto* arrest as Defendant claims. For the following reasons, the Court concludes the November 17, 2022, encounter between Defendant and officers is consistent with a *Terry* stop or investigatory detention rather than a *de facto* arrest.

"The use of some force by a police officer does not necessarily cause an encounter to exceed the scope of *Terry*, which itself involved the use of force." *U.S. v. Sanders*, 994 F.2d 200, 204 (5th Cir. 1993). In *Sanders*, the court identified two Supreme Court cases in which investigatory detentions involving the display of arms were upheld. *Id*. The court also referenced three of its own cases addressing officers who drew their weapons and/or pointed their weapons at suspects during investigatory detentions. *Id*. at 204-205.[3] The court determined the officer did not act unreasonably in immediately drawing his weapon, ordering the suspect to lie face down on the ground, and handcuffing the suspect during an investigatory detention. *Id*. at 206-210.

This Court recognizes officers have two goals during an investigatory stop: (1) to investigate; and (2) to protect themselves during their investigation. *U.S. v. Campbell*, 178 F.3d 345, 348–349 (5th Cir. 1999).[4] The core question this Court must answer is "whether the police

---

[3] *See United States v. Maslanka*, 501 F.2d 208 (5th Cir. 1974), cert. denied, 421 U.S. 912 (1975); *United States v. Worthington*, 544 F.2d 1275 (5th Cir. 1977), cert. denied, 434 U.S. 817 (1977); and *United States v. Holloway*, 962 F.2d 451 (5th Cir. 1992).

[4] *See Terry v. Ohio,* 392 U.S. 1, 23 (1968) ("[I]n addition [to the governmental interest in investigating crime], there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.").

were unreasonable in failing to use less intrusive procedures to conduct their investigation safely." *Id*. at 349. The analysis is conducted on a case-by-case basis. *Id*.

The facts of this case are rather unique. This case does not involve the stop of an unknown driver after an officer witnesses a traffic violation and subsequently approaches the vehicle with his or her gun drawn to investigate. Instead, here officers used two confidential sources to communicate with a person suspected of distributing drugs in and around San Antonio. TFO Camacho, using a cell phone application that allowed him to monitor Defendant's communications with the confidential sources, worked to coordinate a proposed drug transaction at a time and place to minimize threats to officers and the public. He researched and analyzed Defendant's criminal history. Officers conducted a threat or risk assessment for an encounter with Defendant, and determined Defendant presented a high risk based on his history. Officers considered various options to confront Defendant, and decided an assault on his vehicle was the best method to ensure officer and public safety. Officers were aware Defendant was on parole and on bond when they planned to interact with him.

On November 17, 2022, Defendant communicated with the confidential source to schedule a time and place to meet. Officers selected a familiar location for the proposed drug transaction for officer and public safety. Defendant arrived at the officer-selected location driving the vehicle he described in communications with the confidential source. TFO Camacho, using the cell phone application described above, confirmed Defendant was present in the white Chevrolet Impala— parked one gas pump stall away—when Defendant sent a text message to the confidential source to "hop in" to complete the drug transaction. TFO Camacho then communicated to the rest of his team "we got him," and officers began their assault on

Defendant's vehicle. Thirteen total officers were involved and officers' vehicles were used to block Defendant from having a means of escape.

The Officers' encounter with Defendant was a fluid situation. Defendant vehicle's had very dark windows. Officers drew their weapons and commanded Defendant to roll down his driver's side window and show his hands and Defendant complied. TFO Camacho testified he could see Defendant though the windshield and saw Defendant hesitate before complying with the officers' orders. The officers ordered Defendant to roll down the vehicle's windows and then step out of the car. Once out of the car, four officers approached Defendant with their guns still drawn and pointed at him. Defendant was ordered to his knees and officers handcuffed him. The four officers did not holster their weapons because they needed to ensure no one else was in the vehicle. TFO Camacho testified the officers could see no one else was in the front of the vehicle, but officers did not have a clear line of sight through the back windows. With weapons still drawn and pointed at the vehicle, officers cleared it and holstered their weapons.

Defendant left the driver's side door open when he exited the vehicle. Officers could immediately see what they perceived to be drugs packed in Ziploc storage bags on the inside of the driver's side door. Officers also observed United States currency on the floorboard. Approximately five to seven seconds elapsed from the time officers handcuffed Defendant to the time they observed the drugs and money in the car.[5] This gave officers probable cause to search the vehicle. Officers eventually found the weapon that is the subject of the two gun charges in this case.

The Court finds the officers' actions in this case were reasonable under the circumstances. "The line between a valid investigatory stop and an arrest requiring probable

---

[5] *See* Government Exhibit 10, Moczygemba's Bodycam, at 2:27–2:31 (as the officers approached the car to clear it, Ziploc bag near the driver's seat can be seen)

cause is a fine one, but in considering whether the actions of the police were justified under the circumstances, the Supreme Court has cautioned courts not to indulge in unrealistic second-guessing." *U.S. v. Perkins*, 226 F.3d 642 (5th Cir. 2000) (citing *United States v. Hanson*, 801 F.2d 757, 763 (5th Cir. 1986)). Maybe thirteen officers were not needed. Maybe the officers did not need to carry and display rifles. Maybe fewer vehicles could have been used to block Defendant's vehicle. Maybe officers did not have to place Defendant in handcuffs because their weapons were pointed at him and were not holstered until his vehicle was cleared. The Court declines to indulge in unrealistic second-guessing here. *United States v. Sharpe*, 470 U.S. 686–687 (1985) ("A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished."). Defendant has a criminal history suggesting he posed a threat to officers and the public. His criminal history, parole, and bond status were considered by officers in determining the best method to safely detain or arrest Defendant. Officers developed a plan based on a threat assessment to ensure officer and public safety. The officers' pre-encounter deliberation and planning is an indication their ultimate actions were reasonable.

The Court finds the officers' conduct in this case reasonable, the officers had reasonable suspicion to detain Defendant, and the officer's actions did not transform the detention into a *de facto* arrest requiring probable cause.

## CONCLUSION

For all the reasons stated above, the Court to **DENIES** the Defendant's Motion to Suppress. *See ECF No. 49*.

    It is so ORDERED.
    SIGNED this 24th day of June, 2025.

(Signature on Next Page).

_____
JASON PULLIAM
UNITED STATES DISTRICT JUDGE